SUPREME COURT OF ARIZONA
En Banc

| | |
|---|---|
| KLAY KOHL, SR. and GEORGIA KOHL, parents of KLAY CRIS KOHL, JR., deceased, | ) ) ) ) | Arizona Supreme Court No. CV-06-0358-PR |
| Plaintiffs/Appellants, | ) ) ) | Court of Appeals Division One No. 1 CA-CV 05-0087 |
| v. | ) ) | |
| CITY OF PHOENIX, a political subdivision of the State of Arizona, | ) ) ) ) | Maricopa County Superior Court No. CV 1997-022205 |
| Defendant/Appellee. | ) ) ) ) | **O P I N I O N** |

Appeal from the Superior Court in Maricopa County
The Honorable Thomas Dunevant, Judge

**AFFIRMED**

_____

Memorandum Decision of the Court of Appeals, Division One
Filed Oct. 3, 2006

**VACATED**

_____

T.J. MCGILLICUDDY, P.C.                                    Phoenix
     By   Terrence J. McGillicuddy

And

HERZOG AND O'CONNOR, P.C.                                  Scottsdale
     By   Mark O'Connor
Attorneys for Klay Kohl, Sr. and Georgia Kohl

JONES, SKELTON & HOCHULI, P.L.C.                           Phoenix
     By   Eileen Dennis GilBride
          Kathleen L. Wieneke
          John M. DiCaro
Attorneys for City of Phoenix

HARALSON, MILLER, PITT, FELDMAN, & MCANALLY, P.L.C.        Phoenix
    By   Kathleen Hale

And

LAW OFFICE OF JOJENE MILLS                                      Tucson
    By   JoJene E. Mills

And

ADELMAN GERMAN, P.L.C.                                       Scottsdale
    By   Daniel J. Adelman
Attorneys for Amicus Curiae
Arizona Trial Lawyers Association

_____

**H U R W I T Z**, Justice

¶1      The issue in this case is whether the City of Phoenix is immune under Arizona Revised Statutes ("A.R.S.") § 12-820.01 (1992) from liability for its decision not to install a traffic signal at an intersection where the petitioners' son was killed by an automobile.

### I.

¶2      On December 20, 1996, thirteen-year-old Klay Kohl was struck and killed by a car while crossing the intersection at 19th Avenue and Wood Drive in Phoenix ("the Intersection") on his bicycle. Kohl's parents sued the City of Phoenix, claiming that the absence of a traffic light at the Intersection caused Klay's death.

¶3      In response, the City argued that under A.R.S. § 12-820.01 it could not be held liable for its decision not to place

a signal at the Intersection.  Section 12-820.01 provides, in relevant part:

> A. A public entity shall not be liable for acts and omissions of its employees constituting . . . :
>
> . . .
>
> 2. The exercise of an administrative function involving the determination of fundamental governmental policy.
>
> B. The determination of a fundamental governmental policy involves the exercise of discretion and shall include, but is not limited to:
>
> 1. A determination of whether to seek or whether to provide the resources necessary for any of the following:
>
> (a) The purchase of equipment,
>
> (b) The construction or maintenance of facilities[.]
>
> . . .
>
> 2. A determination of whether and how to spend existing resources, including those allocated for equipment, facilities and personnel.

**A.**

¶4     The central issue in this case is whether the City engaged in "[t]he exercise of an administrative function involving the determination of fundamental governmental policy" under § 12-820.01(A)(2) when it decided not to place a signal at the Intersection.  The starting point in our analysis is a review of the process used by the City to make that decision. The basic facts relating to that process are not disputed.

3

¶5     The City's engineering staff annually identifies 150 to 200 intersections that are potential candidates for traffic signals.   The staff then collects information to determine if six "warrants" — threshold criteria for signalization — are satisfied for each of those intersections.[1]   The warrants involve objective data such as traffic volumes, the proximity of school crossings, and collision history.   The collected information is evaluated through a computer program called SIGWAR, which produces a ranked list of those intersections based on the extent to which the warrants have been satisfied.

¶6     City traffic engineers then take roughly the top twenty intersections from the SIGWAR ranking and further evaluate them using additional factors, including safety, efficiency, school issues, right of way, roadside interference, utilities and obstructions, vehicle mix, drainage, alignment/profile, lighting, speed differentials, developmental growth, circulation, sight distance, adjacent development, road

---

[1]     Relying on a definition adopted by the Federal Highway Administration, the City defines a "warrant" as "[a] threshold condition that, if found to be met as part of an engineering study, shall result in analysis of other traffic conditions or factors to determine whether a traffic control signal . . . is justified."   The six warrants chosen by the City were minimum vehicular volume, interruption of continuous traffic, minimum pedestrian volume, progressive movement, accident experience, and combination of warrants.   *See* Fed. Highway Admin., U.S. Dep't of Transp., *Manual on Uniform Traffic Control Devices* 4C-4 to -7 (1988).

improvements, and jurisdictional boundaries.  City staff then recommends eight to ten intersections from this group to the City Council for funding.[2]

¶7      The City repeatedly analyzed the Intersection using SIGWAR in the years before the accident that claimed Klay Kohl's life.[3]  The Intersection was never ranked by SIGWAR higher than seventy-first among the locations surveyed and was usually ranked in the mid-100s.  Because of this ranking, the Intersection never received the more detailed evaluation annually given to the top twenty intersections ranked through the SIGWAR process and was never recommended to the City Council for signalization.

**B.**

¶8      The superior court initially granted summary judgment to the City, holding that the City's decision to use the SIGWAR system to make an initial determination as to which intersections should receive traffic lights was immune from suit

---

[2]    This suit involves only the City's administrative decisions about which intersection should be signalized, and not the eventual decision of the City Council.  This case thus does not require us to determine the applicability of A.R.S. § 12-820.01(A)(1), which provides immunity against suits attacking "[t]he exercise of a . . . legislative function."

[3]    This case therefore does not involve a "decision by default" unprotected by § 12-820.01.  *See Galati v. Lake Havasu City*, 186 Ariz. 131, 136, 920 P.2d 11, 16 (App. 1996) ("Where no actual decision is made, there is no governmental function or statement of public policy at issue.").

under § 12-820.01(A)(2).  The Kohls appealed, and the court of appeals reversed and remanded.  *Kohl v. City of Phoenix* (*Kohl I*), 1-CA-CV 00-0105, ¶ 26 (Ariz. App. Apr. 25, 2002) (mem. decision).

**¶9**      *Kohl I* distinguished claims that the City had been negligent in adopting the SIGWAR program from claims that the City had been negligent in implementing that program:

> When a municipality *adopts* a traffic planning program that includes criteria to establish priorities for the allocation of funds among competing projects, the adoption of that program, in our judgment, does amount to fundamental policymaking.  Thus, a litigant who attempts to trace a traffic injury to a misjudgment in the adoption or design of such a program will encounter the bar of absolute immunity pursuant to A.R.S. § 12-820.01.
>
> If, on the other hand, a litigant attempts to trace a traffic accident not to the adoption of the program, but to the fault of municipal employees in the execution or implementation of the program, such conduct would not be entitled to absolute immunity pursuant to that statute . . . .

*Id.* ¶¶ 22-23.

**¶10**      The court of appeals therefore viewed the dispositive issue to be whether the City's failure to place a traffic signal at the Intersection was "merely the automatic product of the City's program for allocating priorities among intersections," or whether the failure resulted "from the faulty input or collection of data regarding the intersection."  *Id.* ¶ 24.  In the former case, the decision would be entitled to absolute

6

immunity under § 12-820.01. *Id.* In the latter, the failure to place a signal would be an "operational failure, not a policymaking failure," and not entitled to absolute immunity. *Id.*

¶11 On remand, the City again moved for summary judgment, arguing that the decision not to place a traffic signal at the Intersection flowed automatically from the immune decision to adopt the SIGWAR screening program. Although the Kohls claimed that some data concerning the Intersection that had been input into SIGWAR was inaccurate, they did not claim that more accurate data would have caused the Intersection to be ranked highly enough to move into the City's second stage of consideration. The superior court therefore found that any failure to signalize the Intersection resulted from the adoption of the SIGWAR program, not from any "operational failure," and again granted summary judgment to the City.

¶12 The Kohls appealed and the court of appeals again reversed and remanded. *Kohl v. City of Phoenix* (*Kohl II*), 1-CA-CV 05-0087, ¶ 36 (Ariz. App. Oct. 3, 2006) (mem. decision). *Kohl II* held that because the City's program involved not only an initial prioritization by SIGWAR, but also subsequent evaluation of various intersections by City staff, any decision not to signalize the Intersection could not be viewed simply as an automatic result of the policy decision to use the computer

7

program and thus was not immune under § 12-820.01. *Id.* ¶¶ 25-26. In the absence of absolute immunity, the court of appeals found that summary judgment was precluded because of fact issues as to whether the City had acted unreasonably in failing to install a signal at the Intersection. *Id.* ¶¶ 34-35.

¶13 We granted the City's petition for review because the application of § 12-820.01 to traffic signalization decisions is a recurring issue of statewide importance. *See* ARCAP 23(c)(3). We have jurisdiction pursuant to Article 6, Section 5(3) of the Arizona Constitution, A.R.S. § 12-120.24 (2003), and ARCAP 23(a).

## II.

### A.

¶14 *Kohl I* correctly held that the City's decision to use SIGWAR to prioritize intersections for signalization was "fundamental policymaking" and therefore absolutely immune under § 12-820.01.

¶15 As the court of appeals recognized, the City's decision to use a computer program in selecting intersections for prioritization — rather than placing signals at every ostensibly dangerous corner regardless of cost or using some other method of analysis to determine which corners among many worthy candidates received traffic signals — is precisely the sort of policymaking decision protected by § 12-820.01. Under §

8

12-820.01(B), the decision was a determination of "fundamental governmental policy" because it involved the "exercise of discretion" and the "determination of whether to seek or whether to provide the resources necessary for . . . [t]he construction or maintenance of facilities." *See Myers v. City of Tempe*, 212 Ariz. 128, 130 ¶ 10, 128 P.3d 751, 753 (2006) (holding immune under § 12-820.01 an administrative decision that "involved weighing risks and gains, concerned the distribution of assets, and required consulting the city's subject matter experts").

¶16    The statutory immunity is not abrogated because traffic experts can reasonably opine that the City was negligent in relying upon the SIGWAR program in making the first cut of intersections to be considered for signalization. Section 12-820.01(A)(2) immunizes all determinations of fundamental governmental policy, even those that can be shown to fall below a standard of reasonable care.

¶17    The selection of the six warrants as criteria for SIGWAR evaluation is also immune. In *Doe ex rel. Doe v. State*, we held that the Arizona Department of Education's discretionary selection of which criteria to use in the licensing of teachers was entitled to absolute immunity under § 12-820.01. 200 Ariz. 174, 177 ¶ 9, 24 P.3d 1269, 1272 (2001). The City's discretionary selection of the specific criteria to be used in the SIGWAR program involves a similar policy determination. The

9

court of appeals thus quite correctly held that claims that the SIGWAR program was negligently adopted or designed were barred by § 12-820.01.[4]

**B.**

**¶18** *Kohl II* did not retreat from the court's initial determination that the City's use and design of the SIGWAR program was immune from suit under § 12-820.01. Rather, the panel focused on the question that was the subject of the remand — whether the failure to place a signal at the Intersection was the product of that immune decision or instead caused by an

---

[4] The Kohls argue that A.R.S. § 28-641 (1998) and Phoenix City Code 36-11 (2007) require use in SIGWAR of eleven warrants identified by the *Manual on Uniform Traffic Control Devices* ("MUTCD"), not just the six selected by the City. The City considers the remaining five MUTCD factors only in the second stage of its analysis, when reviewing intersections at the top of the SIGWAR priority list.

Section 28-641, however, simply instructs the Department of Transportation "to adopt a manual and specifications for a uniform system of traffic control devices for use on highways in this state"; the system must "correlate with and as far as possible conform to [MUTCD]." The statute does not preclude municipalities from giving particular weight to selected warrants in signalization decisions. Indeed, A.R.S. § 28-643 (1998) expressly grants local authorities discretion to "place and maintain the traffic control devices on highways under their jurisdiction as they deem necessary."

Phoenix City Code § 36-11 merely directs that "traffic control devices shall conform to the Manual on Uniform Traffic Control Devices." The ordinance expressly empowers the Traffic Engineer to place traffic control devices "as he may deem necessary under the traffic ordinances of this City, or under State law." *Id*.

operational failure in execution or implementation of the program by City staff.

¶19    Our cases have repeatedly distinguished between policymaking, which is immune under § 12-820.01, and the implementation of policy — so-called "operational" decisions — which are not entitled to such absolute immunity.  In *Fidelity Security Life Insurance Co. v. Department of Insurance,* we held that § 12-820.01 did not grant absolute immunity to the Department with respect to a claim that it had negligently certified an insurance company.  191 Ariz. 222, 225-26 ¶¶ 11-12, 954 P.2d 580, 583-84 (1998).  The suit did not attack the regulations under which the insurance company was certified, which we noted were "largely controlled by statute."  *Id*. at 226 ¶ 12, 954 P.2d at 584.  Rather, the claim was that the Department had been negligent in implementing the regulatory scheme by certifying the company at issue.  *Id*.  We held that the challenged action therefore involved "operational decisions," rather than fundamental policymaking, and did not fall within the ambit of the absolute immunity provided by § 12-820.01.  *Id*.

¶20    We employed a similar analysis in *Doe*, which involved a claim that the Department of Education had negligently certified a teacher who later molested a student.  200 Ariz. at 175 ¶ 1, 24 P.3d at 1270.  *Doe* recognized that the State's

decision to require certification, "as well as decisions related to such matters as establishing certification procedures," involved a determination of fundamental governmental policy and was therefore immune under § 12-820.01. *Id*. at 177 ¶ 9, 24 P.3d at 1272. But we distinguished such decisions from the issue of whether the State, applying the criteria it had previously selected, erred in issuing a certificate to a particular teacher. *Id*. ¶¶ 9-10. Such "operational actions and decisions within [the] regulatory scheme" were not entitled to immunity under § 12-820.01. *Id*. at 176 ¶ 6, 24 P.3d at 1271.

¶21 We employed similar reasoning in *Myers*, a suit which involved neither certification decisions nor a regulatory scheme. The plaintiff claimed in *Myers* that the City of Tempe negligently dispatched a particular response unit to an emergency. 212 Ariz. at 129 ¶ 4, 128 P.3d at 752. We first held that the City's decision to enter into an intergovernmental agreement with surrounding municipalities regarding emergency responses was a policymaking decision protected under § 12-820.01. *Id*. at 130 ¶ 10, 128 P.3d at 753. Because the agreement mandated dispatch of the closest response unit to the emergency, we then held that the City's "decision" to dispatch the unit at issue was also subject to absolute immunity, as it flowed inexorably from the decision to enter into the compact. *Id*. at 131 ¶ 12, 128 P.3d at 754. In so holding, we

12

distinguished *Fidelity* and *Doe*, noting that *Myers* did not involve a claim that a municipality had erred in making an "implementing decision." *Id.*

**¶22** In distinguishing *Myers*, *Kohl II* relied heavily on the fact that the City staff's recommendations as to which corners to signalize relied not only on SIGWAR, but also on "engineering judgment" and "city-wide traffic operational concerns." *Kohl II*, 1-CA-CV 05-0087, slip op. at ¶ 25. The court of appeals therefore viewed the decision not to place a signal at the Intersection as an operational or implementing decision, rather than a determination of fundamental governmental policy. *Id.*

**¶23** That analysis, however, ignores SIGWAR's role in the City's decision-making process. Only the top twenty or so intersections in the SIGWAR ranking receive the more detailed evaluation described by the court of appeals; no further analysis is done on the remaining intersections. As we have noted above, *Kohl I* correctly held that the City's decision to use SIGWAR to choose the top twenty candidates for signalization was immune from suit under § 12-820.01. The City's decision not to place a signal at the Intersection flowed directly from that immune decision, just as the City of Tempe's decision in *Myers* to dispatch a particular unit flowed directly from its immune decision to enter into the intergovernmental agreement.

13

¶24　　　　Thus, even assuming arguendo that the court of appeals correctly characterized the City's choice of intersections to receive signals from among the top twenty identified by SIGWAR as an operational decision, the Kohls' claim still fails. The Kohls did not claim that any operational decision by the City resulted in the Intersection being omitted from the semi-finalist list of the top twenty SIGWAR locations. The omission of the Intersection from the final list of recommended signalization locations was an automatic product of the City's immune decision to use SIGWAR as an initial screening tool and was thus itself immune under § 12-820.01. *See Myers*, 212 Ariz. at 131 ¶ 12, 128 P.3d at 754 (holding that decision "follow[ing] automatically" from immune policy decision was also immune).

## C.

¶25　　　　In finding the decision not to signalize the Intersection to be operational, the court of appeals also relied upon evidence that, on some occasions, the City has placed signals at intersections not subjected to SIGWAR analysis. That evidence, however, does not affect the City's immunity from suit in this case.

¶26　　　　The Kohls identified three intersections where the City approved signals even though the SIGWAR warrants were not yet satisfied. Each was in an area of new commercial development — the Mayo Hospital, the Desert Ridge shopping

14

center, and the downtown Arizona Center.[5]  The City's decision to signalize these corners before the SIGWAR warrants were satisfied was a permissible anticipatory approach to future traffic issues.  These isolated instances are not evidence that decisions arising out of use of the SIGWAR program were operational in nature.  The record makes plain that for the Intersection — for which meaningful SIGWAR data was already available and where no large-scale commercial development was imminent — an essential prerequisite for obtaining a signal was a sufficiently high SIGWAR initial priority ranking.  The Intersection's failure to obtain such a ranking — a result that flowed directly from the City's policymaking decision about which criteria to include in SIGWAR — was thus an automatic result of a decision immunized from suit under § 12-820.01.[6]

### III.

¶27    The superior court correctly granted summary judgment to the City under A.R.S. § 12-820.01.  We therefore vacate the

---

[5]    The Mayo Hospital and Desert Ridge traffic signals were funded by the projects' developers and therefore did not involve decisions by the City about allocating funding.

[6]    The City did signalize the Intersection after Klay Kohl's death.  But this subsequent remedial measure cannot be used to prove the City's negligence in connection with the accident. Ariz. R. Evid. 407.  Moreover, even if the eventual signalization of the Intersection is evidence that the City no longer strictly followed the SIGWAR program after the accident, it does not demonstrate that the program was not followed before Klay Kohl's death.

15

memorandum decision of the court of appeals and affirm the judgment of the superior court.[7]

_____
                    Andrew D. Hurwitz, Justice

CONCURRING:


_____
Rebecca White Berch, Vice Chief Justice


_____
W. Scott Bales, Justice



**M c G R E G O R,** Chief Justice, concurring.

¶28      I concur in the outcome reached by the Court today, but write separately because I think the Court has applied an unnecessarily complex analysis to resolve this case.

¶29      The legislature is constitutionally empowered to "direct by law the manner in which suits may be brought against the state."  *Clouse ex rel. Clouse v. State*, 199 Ariz. 196, 203

_____

[7]   Because the City's decision not to signalize the Intersection resulted automatically from use of the SIGWAR program, we do not find it necessary today to address the City's broader argument that *every* decision not to signalize an intersection constitutes fundamental policymaking under § 12-820.01, and is therefore immune even if based on negligent operational decisions or faulty data.  *See infra* at ¶¶ 28-33 (concurring opinion).

16

¶ 24, 16 P.3d 757, 764 (2001); *see also* Ariz. Const. art. 4, pt. 2, § 18 ("The Legislature shall direct by law in what manner and in what courts suits may be brought against the State."). In promulgating A.R.S. § 12-820.01, the legislature exercised its authority and specifically declared that certain spheres of governmental conduct shall be absolutely immune from liability. The legislature declared that "[a] public entity *shall not* be liable for acts and omissions of its employees constituting . . . [t]he exercise of an administrative function involving the determination of fundamental governmental policy." A.R.S. § 12-820.01.A (emphasis added). The legislature then identified certain determinations that, as a matter of law, constitute "fundamental governmental policy." Section 12-820.01.B provides, in part:

> The determination of a fundamental governmental policy *involves the exercise of discretion* and *shall include*, but is not limited to:
>
> 1.    A determination of whether to seek or whether to provide the resources necessary for any of the following:
> (a)        The purchase of equipment.
> (b)        The construction or maintenance of facilities.
>
>     . . . .
>
> 2.    A determination of whether and how to spend existing resources, including those allocated for equipment, facilities and personnel.

(Emphasis added.)

17

¶30    The majority seems to agree that the City's signalization decision falls within the statutory language quoted above.  *See* Op. ¶¶ 5-6, 15 (noting that the decision involves the exercise of discretion and whether to seek or provide resources for traffic signals).  Applying the plain language of A.R.S. § 12-820.01, then, the City engaged in a determination of "fundamental governmental policy" when it decided where to install traffic signals and concluded that it would not spend its resources to place a signal at the Intersection.

¶31    That conclusion should end our analysis.  The City's signalization decision falls within an enumerated example of fundamental governmental policy as defined by statute, and the City therefore benefits from the absolute immunity granted by the legislature.

¶32    The situation here differs from those in cases that required additional analysis by the courts.  In *Doe ex rel. Doe v. State*, 200 Ariz. 174, 24 P.3d 1269 (2001), for instance, two separate sections of the immunity statute addressed licensing decisions involving teachers.  We concluded, after examining the statutory language and legislative history, that the legislature intended to grant absolute immunity for licensing decisions that fell within A.R.S. § 12-820.01, but only qualified immunity to those implementing decisions that fell within section 12-820.02.

18

*Id.* at 176-78 ¶¶ 7-11, 24 P.3d at 1271-73. In decisions such as *Fidelity Security Life Insurance Co. v. Department of Insurance*, 191 Ariz. 222, 954 P.2d 580 (1998), and *Myers v. City of Tempe*, 212 Ariz. 128, 128 P.3d 751 (2006), we considered the effect of allegations that government employees had failed to apply policies adopted under the grant of immunity of section 12-820.01. *See, e.g., Myers*, 212 Ariz. at 130-31 ¶¶ 10, 14, 128 P.3d at 753-54 (noting that the dispatcher followed a policy the city adopted in an intergovernmental agreement, the latter being a decision that both parties conceded was absolutely immune); *Fidelity*, 191 Ariz. at 224 ¶ 5, 226 ¶ 12, 954 P.2d at 582, 584 (explaining that the decision at issue "did not involve the use or exercise of discretion" and merely implemented "an established regulatory scheme largely controlled by statute"). This case presents no comparable allegation.

¶**33** I would conclude, as I think the majority does, that this case involves a discretionary governmental decision and falls within a statutorily enumerated category constituting the determination of fundamental governmental policy. That conclusion, in my view, is determinative of the City's right to immunity.

_____
Ruth V. McGregor, Chief Justice

19

CONCURRING:

_____
Michael D. Ryan, Justice