NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

CLIFFORD T. MORTENSEN, SR. and SYLVIA A. MORTENSEN, as
Co-Trustees of the Clifford T., Sr. and Sylvia A. Mortensen Living Trust
dated, December 15, 2004; VIRGINIA LOUISE MORTENSEN,
as Successor Trustee of the Azel Jack Mortensen and Virginia Louise
Mortensen Living Trust, dated October 20, 1992; FOREST B. ALLISON
and GLORIA ALLISON, as Co-Trustees of the Allison Family Trust;
BYRD ENTERPRISES OF ARIZONA, INC., an Arizona corporation;
AVONDALE BOULEVARD, LLC, an Arizona limited liability company;
TIFFANY CONSTRUCTION, INC., an Arizona corporation; CARLOS
O'BRIEN'S SCOTTSDALE L.L.C., an Arizona limited liability company,
and WINNERS DEVELOPMENT, LLC, an Arizona limited liability
corporation, *Plaintiffs/Appellants,*

*v.*

GUST ROSENFELD, PLC, an Arizona professional corporation;
ANDREW J. MCGUIRE and DENISE MCGUIRE, husband and wife,
*Defendants/Appellees,*

CITY OF AVONDALE, an Arizona municipal corporation,
*Defendant/Appellee.*

No. 1 CA-CV 14-0262
FILED 10-27-2015

Appeal from the Superior Court in Maricopa County
No.  CV 2012-008177
The Honorable J. Richard Gama, Judge

**AFFIRMED IN PART; REVERSED IN PART; REMANDED**

COUNSEL

Russell Piccoli, P.L.C., Phoenix
By Russell Piccoli
*Counsel for Plaintiffs/Appellants*

Lewis Roca Rothgerber, L.L.P., Phoenix
By Susan M. Freeman
*Counsel for Defendants/Appellees*

Quarles & Brady, L.L.P., Phoenix
By Nicole France Stanton, Lauren Elliott Stine, Brian A. Howie
*Counsel for Defendant/Appellee City of Avondale*

---

**MEMORANDUM DECISION**

Presiding Judge Margaret H. Downie delivered the decision of the Court, in which Judge Patricia A. Orozco and Judge Maurice Portley joined.

---

**D O W N I E**, Judge:

¶1        Clifford and Sylvia Mortensen, as Co-Trustees of the Clifford T., Sr. and Sylvia A. Mortensen Living Trust, Virginia Mortensen, as Successor Trustee of the Azel Jack Mortensen and Virginia Louise Mortensen Living Trust, Forest and Gloria Allison, as Co-Trustees of the Allison Family Trust, Byrd Enterprises of Arizona, Inc., Avondale Boulevard, LLC, Tiffany Construction, Inc., O'Brien's Scottsdale, L.L.C. ("O'Brien's"), and Winners Development, LLC (collectively, "Appellants") appeal the dismissal of their civil claims against the City of Avondale ("the City"), Gust Rosenfeld PLC, and Andrew and Denise McGuire (collectively, "Appellees"). For the following reasons, we affirm in part, reverse in part, and remand for further appropriate proceedings.

**FACTS AND PROCEDURAL HISTORY**[1]

¶2        For several years, the City has considered pursuing a commercial development project known as the Avondale City Center ("City Center").  Among other things, the project would require the City to obtain financing and acquire several parcels of real property.

¶3        The City began discussing City Center with developer Winners Development ("Winners").  In July 2011, the City and Winners signed a Memorandum of Understanding ("MOU").  The City and Winners later signed a Letter of Intent and Understanding ("LOI") in October 2011.

¶4        Winners arranged for a form of financing through National Standard Finance ("NSF") and worked with Tiffany Construction ("Tiffany") to obtain construction cost estimates.  Winners also obtained contracts to purchase necessary parcels of real property from the Mortensen Trusts, the Allison Trust, Byrd, and Avondale Boulevard (collectively, "the Landowners").

¶5        In December 2011, Winners and the City discussed assigning the land purchase contracts to the City in exchange for an assignment fee.  Winners anticipated that the proposed assignment would be approved at a December 19 City Council meeting because the purchase contracts were set to expire at the end of December.  However, on December 16, Andrew McGuire — a partner with the law firm of Gust Rosenfeld who serves as City Attorney for the City — requested additional information regarding the properties, including surveys, topographical maps, and environmental reports.[2]  As a result, Winners extended the purchase contracts at an additional cost.

¶6        In January 2012, McGuire informed Winners' counsel that the City Council would not discuss the proposed assignment at its January meeting and requested a new set of conditions.  On January 9, the

---

[1]        Our recitation of the facts is based on the first and second amended complaints.  *See Logan v. Forever Living Products Int'l, Inc.*, 203 Ariz. 191, 192, ¶ 2 (2002) (when reviewing dismissal under Rule 12(b)(6), we assume truth of well-pleaded facts).

[2]        McGuire's spouse is also named as a defendant.  References to "McGuire" in the singular are to Andrew McGuire.  Gust Rosenfeld and the McGuires are referred to collectively as "the Lawyer Defendants."

City's Economic Development Director advised Winners that the City had obtained appraisals of the properties and that the appraised values "were below what the City was to pay for them." According to Appellants, McGuire provided these appraisals to the City Council, which thereafter rejected the purchases of the Landowners' properties. Appellants allege that the City-obtained appraisals were "knowingly based on false premises and did not remotely state the fair value of the assembled parcels."

¶7         On January 23, 2012, Winners filed a notice of claim against the City pursuant to Arizona Revised Statutes ("A.R.S.") section 12-821.01, demanding $62,793,824. On February 1, 2012, the City Manager sent correspondence to Winners stating that the City had determined the City Center project was "not feasible as contemplated in either the MOU or the LOI" and that the City wished "to terminate the MOU and the LOI."

¶8         Winners filed the original complaint in this matter in May 2012. An amended complaint was subsequently filed that added the remaining plaintiffs and several causes of action ("amended complaint"). With leave of court, Appellants later filed a first amended complaint ("FAC").

¶9         Appellees moved to dismiss the amended complaint and FAC pursuant to Arizona Rule of Civil Procedure 12(b)(6). The superior court granted their motions. Appellants sought leave to file a second amended complaint and also moved to reinstate their contract claims (essentially seeking reconsideration of the dismissal of those claims). The superior court denied the motion to reinstate but, over objection, allowed Appellants to file a second amended complaint ("SAC").

¶10         The Lawyer Defendants and the City separately moved to dismiss the SAC. The superior court granted both motions. Appellants timely appealed.[3] We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1) and -2101(A)(1).

### DISCUSSION

¶11         Appellants seek to reinstate counts one through four of the

---

[3]         The City filed a cross-appeal that has since been dismissed.

FAC[4] and counts four through ten of the SAC.[5] We review the dismissal of those counts pursuant to Rule 12(b)(6) *de novo*. *See Coleman v. City of Mesa,* 230 Ariz. 352, 355, ¶ 7 (2012). "We will uphold dismissal only if the plaintiffs would not be entitled to relief under any facts susceptible of proof in the statement of the claim." *Dressler v. Morrison*, 212 Ariz. 279, 281, ¶ 11 (2006).

## I.    Contract Claims

¶12         As a threshold matter, we reject the City's contention that Winners' failure to reassert its contract claims in the SAC precludes our review of the dismissal of those claims. No Arizona court has adopted the Ninth Circuit's decidedly minority view that "a plaintiff waives all claims alleged in a dismissed complaint which are not realleged in an amended complaint." *Lacey v. Maricopa Cty.*, 693 F.3d 896, 925, 928 (9th Cir. 2012) (deciding to limit this rule to claims which were "voluntarily dismissed"). Even the Ninth Circuit has acknowledged it is "an outlier among the circuits," going so far as to characterize the position as "formalistic and harsh." *Id.* at 927; *see also Young v. City of Mount Ranier*, 238 F.3d 567, 572–73 (4th Cir. 2001) ("[I]f a claim is dismissed without leave to amend, the plaintiff does not forfeit the right to challenge the dismissal on appeal simply by filing an amended complaint that does not re-allege the dismissed claim."); *Davis v. TXO Prod. Corp.*, 929 F.2d 1515, 1518 (10th Cir. 1991) ("[A] rule requiring plaintiffs who file amended complaints to replead claims previously dismissed on their merits in order to preserve those claims merely sets a trap for unsuspecting plaintiffs with no

---

[4]    Count one is Winners' breach of contract claim against the City. Count two is Winners' breach of the covenant of good faith and fair dealing claim against the City. Count three is Winners' breach of fiduciary duty claim against the City. Count four is Winners' "Joint Liability for Breach of Fiduciary Duty" claim against the Lawyer Defendants.

[5]    Count four is the Landowners' intentional interference claim against the City. Count five is Tiffany's intentional interference claim against the City. Count six is Winners' intentional interference claim against the Lawyer Defendants. Count seven is the Landowners' intentional interference claim against the Lawyer Defendants. Count eight is Tiffany's intentional interference claim against the Lawyer Defendants. Count nine is O'Brien's intentional interference claim against the Lawyer Defendants. Count ten is Winners' "Aiding and Abetting Fraud" claim against the Lawyer Defendants.

concomitant benefit to the opposing party."); 6 Charles Alan Wright et al., *Federal Practice & Procedure* § 1476 (3d ed.), Westlaw (database updated April 2015) ("A rule that a party waives all objections to the court's dismissal if the party elects to amend is too mechanical and seems to be a rigid application of the concept that a Rule 15(a) amendment completely replaces the pleading it amends."). We turn, then, to an analysis of whether the superior court properly dismissed Winners' contract claims under Rule 12(b)(6).

¶13        In the FAC, Winners alleged that the City was liable for breach of contract (count one) and breach of the covenant of good faith and fair dealing (count two). The superior court identified the dispositive question as whether the MOU and/or LOI "constitute a sufficiently definite contract to negotiate in good faith, v. an unenforceable agreement to agree." The court then ruled that the MOU and LOI "unequivocally state they are subject to future approval and are not final, binding agreements." Although the court recognized that "[t]he ultimate question is the intent of the parties," it concluded both documents reveal "a clear expression of intent not to be bound."

¶14        Interpretation of a contract is a mixed question of law and fact that we review *de novo*. *Johnson Int'l, Inc. v. City of Phx.*, 192 Ariz. 466, 470, ¶ 19 (App. 1998). Courts generally should not dismiss claims under Rule 12(b)(6) "where there is conduct which could be construed as binding that is sufficient to create a question of fact for the trier. However, where there is explicit language that the parties do not intend to be bound until a condition precedent, no fact question exists." *Id.* at ¶ 20. "[W]here there is an express nonbinding clause, we will honor it and not look to surrounding circumstances to imply an obligation at variance with the express clause." *Id.* at 473, ¶ 43.

¶15        Appellants are not appealing the determination that the MOU is not a binding agreement upon which contract-based claims can be predicated. Nevertheless, we briefly discuss the MOU because it is relevant to our assessment of claims based on the LOI.

¶16        As the superior court found, the MOU contains several provisions that reflect its non-binding nature, including:

> This agreement does not constitute a commitment by the City to obtain lands for the development of the City Center outside of those properties that the City currently owns or controls. . . . It is understood that specific project

development proposals will need to obtain Site Plan approval by City Council and that any assistance by staff does not constitute such approval.

It is also understood that this agreement does not in itself constitute a commitment by the city to enter into an Economic Development Agreement with Winners for the development of specific projects. The City, subject to the approval by the City Council acting in its sole discretion, may enter into Economic Development Agreements that benefit the City on a case-by-case basis.

¶17 Additionally, the MOU is quite general in describing the parties' respective undertakings. It states, for example, that the "City shall remain supportive of Winners' interests in acquiring and planning" and "will assist Winners in its due diligence and provide support for a comprehensive planning effort." The City also agrees to "provide a cooperative working relationship" and to "use its best efforts to respond to requests made by Winners in a timely manner." Winners, in turn, agrees to "use its best efforts and influence to assist and support the City" in attracting tenants, employers, and other third parties vital to the City Center concept.

¶18 The LOI is substantively different. Its stated purpose is to "further define and memorialize the intents of the Parties" as outlined in the MOU, and it provides that the LOI "is a continuation of the process begun with the MOU." Yet the LOI does not incorporate the terms of the MOU, and the LOI is much more specific than the MOU in many respects. Among other things, the LOI obligates the City to "use its best efforts to support the development of City Center in the following specific tasks:"

- Cooperate and assist Winners with acquiring the real property needed for the initial phase of City Center.

- Cooperate and assist Winners with the planning and scheduling of infrastructure design and budgeting.

- "Work closely with Winners to produce a Development Agreement outlining in specificity how each Party will behave in the development of City Center."

- Work closely with Winners to refine and agree on the financing mechanisms to be used to acquire the real

property, "the design and construction of the infrastructure and the acquisition of certain City assets. The financial model will include a strategy to ensure that contributions from the City will not occur until at least three years after closing on the acquisition of all of the Real Property (the 'Closing'). Additionally, the financial model shall include Winner's acquisition of specific real property assets currently owned by the City."

- Work closely with Winners and NSF "to produce a lease document that will serve as the basis for financing the acquisition of the Real Property and the design and construction of the public infrastructure."

- "Facilitate a fast-track approach to approvals required for the review and permitting of infrastructure improvements within City Center."

The LOI, in turn, states that Winners "shall use its best efforts and resources to lead the development of City Center in the following specific tasks:"

- Primary responsibility for acquiring the necessary real property.

- Primary responsibility for planning and scheduling infrastructure design and budgeting.

- Primary responsibility for producing "a Development Agreement outlining, in specificity, how each Party will behave in the development of City Center."

- Primary responsibility for providing the financing source and refining "the financial model relating to the financing mechanisms that will ultimately be utilized to finance the acquisition of the Real Property, the design and construction of the infrastructure and the acquisition of certain City assets. The financial model will include a strategy to ensure that contributions from the City will not occur until at least three years after the Closing. Additionally the financial model shall include

Winners' acquisition of specific real property assets currently owned by the City."

- Primary responsibility for working with NSF "to produce a lease document which will serve as the basis for financing the acquisition of the Real Property, and the design and construction of the public infrastructure."

- Primary responsibility "to work with and attract corporate employers, amateur and professional sports, higher education, retail and entertainment, medical and residential tenants to City Center."

¶19 There are also substantive differences in the language that immediately precedes the parties' signatures on the two documents. The MOU reads:

**IN WITNESS WHEREOF**, by executing this Letter of Understanding and Intent, [sic] the Parties hereto acknowledge that they understand and *agree to the content* of this Agreement. (Emphasis added.)

The LOI states:

**IN WITNESS WHEREOF**, by executing this Letter of Intent and Understanding, the Parties hereto acknowledge that they understand and *agree to the terms and conditions* set forth herein. (Emphasis added.)

¶20 We recognize that the above-quoted language from the LOI is similar to language considered in *Johnson*. *See* 192 Ariz. at 468, ¶ 6 ("IN WITNESS WHEREOF, the parties have executed this Agreement . . . and bind their respective entities to the terms and obligations herein contained."). Standing alone, the differences in verbiage between the MOU and LOI may not be particularly compelling. But where, as here, the same parties elect to employ different language in documents signed less than ten weeks apart, it raises the question whether they intended an assent to "terms and conditions" (LOI) to mean something different from an agreement "to the content" of the MOU.

¶21 Additionally, unlike the MOU, which expressly states that the City Council has final decision-making authority regarding matters discussed therein, the LOI is silent about City Council involvement. This

is another distinguishing fact from *Johnson*, where the memorandum of understanding expressly stated that the City would not be bound unless Bureau of Reclamation approval was obtained. *See id*. at 472, ¶ 35. Moreover, the MOU in *Johnson* included clear non-binding language, stating:

> This memorandum is not intended to be the final agreement or to include all of the material terms, which shall be subject to further negotiations, and it shall not be binding on either party.

*Id*. at 468, ¶ 5. Despite the City's repeated protestations to the contrary, the LOI at issue here lacks similarly clear non-binding language.

¶22        Appellees articulate policy concerns about treating letters of intent as binding agreements. But the relevant inquiry is the parties' intent, not the title given a particular document. *See, e.g., Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 315 (9th Cir. 1996) (holding that a letter of intent may be a contract, regardless of its title, and that a court must "study the words and context to decide"); *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 300 (3d Cir. 1986) (sufficient evidence for trier of fact to decide whether landlord breached agreement to negotiate in good faith by terminating discussions and leasing to third party); *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 497, 499 (S.D.N.Y. 1987) (noting that "[l]abels such as 'letter of intent' or 'commitment letter' are not necessarily controlling although they may be helpful indicators of the parties' intentions," and holding that commitment letter required both sides to negotiate in good faith to reach final agreement).

¶23        We hold that the allegations of counts one and two of the FAC, insofar as they are premised on the LOI, were sufficient to avoid dismissal under Rule 12(b)(6). We express no opinion about the scope of the obligations, if any, arising under the LOI, *cf. Channel Home Ctrs.*, 795 F.2d at 298 (distinguishing between contention that letter of intent set binding lease terms versus "a mutually binding obligation to negotiate in good faith"), or Winners' ability to withstand proceedings under Rule 56 based on a more fully developed record and arguments focused on, *inter alia*, other essential elements of contract formation.

## II.        Breach of Fiduciary Duty

¶24        In count three of the FAC, Winners alleged a breach of fiduciary duty by the City. In count four, Winners alleged "Joint Liability

for Breach of Fiduciary Duty" against the Lawyer Defendants. The superior court's dismissal of these counts was predicated on its dismissal of the breach of contract claims. Because we have reversed the dismissal of the breach of contract claim, the underpinnings of the superior court's order no longer exist, and we therefore reverse the dismissal of the breach of fiduciary duty count against the City and the joint liability for breach of fiduciary duty claim against the Lawyer Defendants, again expressing no opinion regarding the substantive merits of these claims.[6]

## III. Intentional Interference Claims

### A. Landowners and Tiffany v. City

¶25 The superior court dismissed the Landowners' and Tiffany's intentional interference claims against the City on alternative grounds: immunity under A.R.S. § 12-820.01, and failure to state a claim upon which relief could be granted under Rule 12(b)(6). Because we agree that the City is entitled to immunity, we need not reach the court's alternative holding. *See Ariz. Bd. of Regents v. State ex rel. Ariz. Pub. Safety Ret. Fund Manager,* 160 Ariz. 150, 154 (App. 1989) (appellate court will affirm superior court's decision if it is correct for any reason).

¶26 Determining whether a municipality is entitled to immunity is a question of law for the court. *Galati v. Lake Havasu City*, 186 Ariz. 131, 134 (App. 1996). The City has absolute immunity for certain actions, including "determination[s] of whether to seek or whether to provide the resources necessary for . . . [t]he construction or maintenance of facilities," and "determination[s] of fundamental governmental policy [including] . . . whether and how to spend existing resources." A.R.S. § 12-820.01(A)(2), (B)(1)(b), (B)(2). "[A] public entity is entitled to immunity if it makes an actual decision or affirmative act. An actual decision is made when deciding to do something or deciding not to do something." *Tostado v. City of Lake Havasu*, 220 Ariz. 195, 199, ¶ 16 (App. 2008). Determinations of fundamental governmental policy include matters such as

> whether government or its agencies should pursue one general course of action over another, whether an agency of

---

[6] In their answering brief, the Lawyer Defendants raise numerous substantive arguments regarding this claim — arguments more appropriately addressed to the superior court on remand in a non-Rule 12(b)(6) context.

government should construct a particular building or where the building should be located, or a decision as to the direction and focus of an entire regulatory scheme. . . . [as well as] decisions on whether to provide resources for the purchase of equipment [or] the construction or maintenance of facilities.

*Fid. Sec. Life Ins. Co. v. State Dep't of Ins.*, 191 Ariz. 222, 225, ¶ 11 (1998).

¶27 The City's challenged actions, including deciding not to approve purchase contracts with the Landowners (or assignments thereof), to request a non-recourse lease, and to obtain and rely on appraisals, involve determinations of fundamental governmental policy — including whether and how to expend funds and develop property — as contemplated by A.R.S. § 12-820.01. *Cf. Myers v. City of Tempe*, 212 Ariz. 128, 131, ¶ 10 (2006) (city's agreement relating to emergency services "indisputably determined fundamental governmental policy").

¶28 Nothing in the statute or appellate precedent supports Appellants' suggestion that the "determinations" protected by the immunity statute must be formally enacted decisions of a municipal body. Nor do the allegations regarding McGuire's alleged misconduct vitiate statutory immunity. *Cf. Kohl v. City of Phx.*, 215 Ariz. 291, 296, ¶ 21 (2007) (city's decision to dispatch particular emergency unit "flowed inexorably" from decision to enter intergovernmental agreement on emergency responses so immunity applied to both). Once again, nothing in the statute or relevant caselaw indicates that a plaintiff may circumvent statutory immunity by parsing intermediate acts and decisions that culminate in otherwise-protected municipal determinations — a proposition that would largely gut governmental immunity.

¶29 The superior court properly dismissed the Landowners' and Tiffany's intentional interference claims against the City.

### B. Winners v. Lawyer Defendants

¶30 Winners seeks reinstatement of the SAC's intentional interference count against the Lawyer Defendants. Tortious interference with economic relations requires a plaintiff to plead: (1) the existence of a valid contract or business expectancy; (2) the defendant's knowledge thereof; (3) intentional interference inducing or causing a breach or termination thereof; and (4) damages. *See Dube v. Likins*, 216 Ariz. 406, 411, ¶ 8 (App. 2007). Additionally, the alleged interference must be

improper in some manner. *See Safeway Ins. v. Guerrero*, 210 Ariz. 5, 11–12, ¶ 21 (2005).

¶31 In the SAC, Winners alleged that McGuire knew of its "prospective contractual relationship with the City" for the development of City Center; knew of its outstanding purchase contracts with the Landowners, and knew "Winners had a prospective business opportunity with NSF to provide the financing to purchase the real properties and install the infrastructure" for City Center. Winners alleged McGuire "intentionally interfered with Winners' prospective economic relationship with NSF by falsely advising NSF that Arizona State law required any lease with the City to be non-recourse." According to Winners, McGuire knew his representations were false, knew "no reasonable lender" would finance the project "with no binding obligation for repayment," and knew "his representations to NSF would cause NSF to withdraw from the transaction." Winners also alleged McGuire obtained "false appraisals," which he furnished to the City Council "with the knowledge that those appraisals would cause the City to not purchase the subject parcels," to terminate negotiations with Winners, and to "cause the termination of all of Winners' purchase contracts for the subject parcels." Winners alleged McGuire took these actions "outside the scope of his agency with the City" and acted with improper purposes.

¶32 Although we have reservations about Winners' ability to withstand a motion for summary judgment on this count, we conclude that the well-pled allegations of the SAC, taken as true, were sufficient to withstand dismissal under Rule 12(b)(6).[7] Winners alleged the essential

---

[7] On a more fully developed record, the Lawyer Defendants may well establish that McGuire was acting as the City's agent and in accordance with the City's wishes and that Appellants' allegations to the contrary lack legal or evidentiary support. *See, e.g., Am. Family Mut. Ins. v. Zavala*, 302 F. Supp. 2d 1108, 1121 (D. Ariz. 2003) ("[A] client and lawyer, acting in an agency relationship, constitute a single entity." Therefore, an attorney, "if acting within the scope of his or her representation, is immune from liability for tortious interference with a client's contract."); *Campbell v. Westdahl*, 148 Ariz. 432, 438 (App. 1985) ("A party cannot be held liable in tort for intentional interference with its own contract."). Appellees may also develop their ratification arguments and their contention Appellants have conceded the agency issue. *But see Black v. Perkins*, 163 Ariz. 292, 293 (App. 1989) ("When a party by pleading or stipulation has agreed to a certain set of facts, he may not contradict them.

elements of a tortious interference claim, and the Lawyer Defendants' answering brief rejoinders (including their characterization of the issue on appeal as "[w]hether City Attorney's alleged conduct was within the scope of his duties to his client") are more appropriate for a motion for summary judgment, rather than a Rule 12(b)(6) motion.

## C.    Landowners, O'Brien's, and Tiffany v. Lawyer Defendants

¶33        Tiffany, O'Brien's, and the Landowners also asserted intentional interference counts against the Lawyer Defendants in the SAC. They alleged: (1) McGuire knew the Landowners had contracts to sell their properties to Winners; (2) McGuire knew Tiffany "had been engaged by Winners to prepare cost estimates for the construction of all the infrastructure in the City Center development;" (3) McGuire knew O'Brien's had leased land for a restaurant "whose success would necessarily be dependent upon the build-out of the entire City Center development;" and (4) McGuire took actions for his own economic self-interest and for that of his law firm, and against the City's interests, causing termination of the Landowners' purchase contracts and the failure of Tiffany "to secure the construction contracts to build" City Center.

¶34        As discussed *supra*, Appellants must plead (and ultimately prove) the existence of a valid contract or business expectancy. *See Dube*, 216 Ariz. at 411, ¶ 8. Such an expectancy must be "evidenced by an actual and identifiable understanding or agreement which in all probability would have been completed if the defendant had not interfered." *Id.* at 414, ¶ 19. The expectancy must constitute more than a mere hope. *Id.* at 412, ¶ 14; *Marmis v. Solot Co.*, 117 Ariz. 499, 502 (App. 1977) (investor's alleged expectancy insufficient because it "was clearly conditioned upon the absence of other bidders and upon court approval, and if anything, amounted only to a hope").

¶35        The record supports the dismissal of Tiffany's intentional interference claims. The operative pleadings make clear that Tiffany's "expectancies" were nothing more than multiple layers of hope that, in turn, were contingent on myriad factors. Tiffany's own allegations demonstrate this reality. Tiffany alleged, for example, that "*if* its bids

---

. . . When the parties have framed the issues for resolution, they may not change them *absent an amendment of the pleadings* or trial of the issue by consent.") (emphasis added).

were competitive," it would be awarded the construction contract for City Center. (Emphasis added.) Tiffany's complaint suggested Winners would essentially rig the bidding process to ensure it received the contract. But even before reaching that point, numerous contingencies existed, any of which could derail the City Center development and/or Tiffany's involvement therein.

¶36      O'Brien's interference claim against the Lawyer Defendants suffers from these same deficiencies but is even more tenuous. O'Brien's signed its lease "in or about January 2011" — months before the MOU and LOI were signed.

¶37      The Landowners are in a materially different position because they had existing contracts with Winners. As a result, unlike Tiffany and O'Brien's, the Landowners' allegations were sufficient to withstand dismissal under Rule 12(b)(6) regarding the first element of the claim — the existence of a valid contract or business expectancy.

¶38      Turning to the other elements of the cause of action, the Landowners alleged McGuire knew of their contracts and wrongfully interfered with them by: (1) causing NSF to withdraw from the project by "falsely advising NSF that Arizona State law required any lease with the City to be non-recourse;"and (2) obtaining and furnishing the City Council with "false appraisals," knowing that such action would cause the City to vote against the purchases and assignments and to terminate its agreements with Winners. The Landowners further alleged that the Lawyer Defendants acted with improper motives in that they sought to further their own personal interests to the detriment of the City.

¶39      The Lawyer Defendants argue the purchase contracts gave Winners "the right, but not the obligation, to purchase Landowners' properties for negotiated prices by a deadline. When [Winners] did not exercise the purchase rights by the agreed-upon deadline (as extended), the contracts 'expire[d] by their terms' — they were not breached." Once again, this is an argument better suited for summary judgment. The record does not include the contracts between Winners and the Landowners (the FAC and SAC call them "purchase contracts," while Appellees characterize them as "option contracts"). We obviously cannot affirm dismissal of this count on the basis that no breach occurred when the record does not even include the contract documents. And while the "improper" prong of the intentional interference claim is clearly subject to further litigation, a dismissal on that basis is inappropriate under Rule 12(b)(6) standards. *See, e.g., Safeway*, 210 at 11–12, ¶¶ 20–22 (in assessing

whether alleged conduct was "improper" in summary judgment context, court primarily considers the nature of the defendant's conduct or means used and the defendant's motive); *Snow v. W. Sav. & Loan Ass'n*, 152 Ariz. 27, 34 (1986) (Whether defendant acted improperly is determined by "weighing the social importance of the interest the defendant seeks to advance against the interest invaded.").

¶40　　　We affirm the dismissal of Tiffany's and O'Brien's intentional interference claims against the Lawyer Defendants. We reverse the dismissal of the Landowners' intentional interference claim against the Lawyer Defendants based on Rule 12(b)(6).

## IV.　　Aiding and Abetting/Fraud

¶41　　　In the SAC, Winners alleged common law fraud and fraud by omission against the City, as well as aiding and abetting fraud against the Lawyer Defendants. The superior court dismissed those counts, concluding Winners had failed to comply with A.R.S. § 12-821.01(A) (2014), which states:

> Persons who have claims against a public entity or a public employee shall file claims with the person or persons authorized to accept service for the public entity or public employee as set forth in the Arizona rules of civil procedure within one hundred eighty days after the cause of action accrues. The claim shall contain facts sufficient to permit the public entity or public employee to understand the basis on which liability is claimed. The claim shall also contain a specific amount for which the claim can be settled and the facts supporting that amount. Any claim that is not filed within one hundred eighty days after the cause of action accrues is barred and no action may be maintained thereon.

¶42　　　On appeal, Winners asks us to reinstate only count ten — the aiding and abetting fraud claim against the Lawyer Defendants. Winners does not seek reinstatement of its common law fraud and fraud by omission claims against the City.

¶43　　　Without the underlying fraud counts against the City, Winners' aiding and abetting claim against the Lawyer Defendants fails as a matter of law. The first element of an aiding and abetting claim is that the allegedly aided and abetted defendant commit the wrongful act. *See, e.g.*, *Wells Fargo Bank v. Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 485, ¶ 36 (2002) (aiding and abetting "is

a theory of secondary liability"); *Caruthers v. Underhill*, 230 Ariz. 513, 526, ¶ 54 (App. 2012) (aiding and abetting claim properly dismissed based on dismissal of claim against alleged primary wrongdoer). We therefore affirm the dismissal of count ten of the SAC.

## CONCLUSION

¶44        We reverse the dismissal of counts one through four of the FAC and counts six and seven of the SAC, and we remand those counts to the superior court for further appropriate proceedings. We affirm the superior court's judgment in all other respects. All parties request an award of attorneys' fees and costs on appeal pursuant to A.R.S. § 12-341.01. In the exercise of our discretion, we deny all fee requests. We award Appellees their taxable costs on appeal against Tiffany and O'Brien's upon compliance with ARCAP 21. We make no further cost awards, as the remaining parties have all partially prevailed.



Ruth A. Willingham · Clerk of the Court
F I L E D : ama